# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

ERIC SMILEY,

      Petitioner,

v.                                              Case No. 03-C-0656

GARY McCAUGHTRY, Warden,

      Respondent.

## DECISION AND ORDER

Petitioner Eric Smiley, a Wisconsin state prisoner, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction of first-degree intentional homicide after a jury trial in Milwaukee County Circuit Court, for which he received a life sentence with eligibility for parole not commencing for forty years. Petitioner challenges the state court of appeals's decisions: (1) refusing to suppress a statement allegedly obtained by the police in violation of Miranda; (2) rejecting his claim that the jury instruction concerning mitigation of first-degree intentional homicide to second-degree intentional homicide based on the use of unnecessary force (imperfect self-defense) violated his right to due process; and (3) rejecting his argument that his trial counsel was ineffective in several respects, including by failing to advise him of the elements of second-degree intentional homicide and how such elements related to his decision whether or not to testify.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A.    Relevant Facts

In the early morning hours of June 6, 1997, Monica Walters discovered the body of her boyfriend, Christopher Garrett, who had been shot. Monica contacted the police, and after the police spoke with her and others, they expressed an interest in talking to petitioner. When

petitioner discovered that the police wanted to talk to him, he telephoned them. The police told him to remain where he was and immediately dispatched several squad cars to pick him up. The police also discovered the existence of an outstanding municipal court warrant for petitioner, and when they picked petitioner up, they arrested him based on the warrant.

### 1. First Statement

After arresting petitioner, the police placed him in a holding cell in the police station, after which they moved him to an interview room. At about 5:00 p.m., two detectives entered the room and told petitioner that he was not a suspect but that they wanted to question him about the shooting of Christopher. They did not give petitioner Miranda warnings. The detectives questioned petitioner, and in response, petitioner told them that his grandparents owned the home that he lived in, that he lived upstairs, that Monica lived downstairs and that Christopher had recently moved in with Monica. The three of them shared a kitchen and bathroom on the first floor. Petitioner denied any knowledge of Christopher's shooting but said that burglars had broken into the home several times. He said that Christopher had not mentioned having problems with anyone and that he had no idea who might have wanted to harm him. He said that he had last seen Christopher at home on the previous afternoon and had spoken with him. Petitioner said that he had spent the night at a friend's home. He denied owning a handgun and said he had not handled one since having been arrested on a weapons charge in Chicago six years before. He said that he found out that Christopher had been shot that afternoon when a friend's mother informed him of it. Petitioner said that he then went to his grandmother's home, and Monica told him that someone had broken into the house and shot Christopher.

At some point in the interview, the detectives noticed that petitioner was limping and when they asked him about the limp, petitioner said that he had tripped the previous day and

injured his knee. The detectives also noticed abrasions on petitioner's forehead and finger and questioned him about them. Petitioner responded that he did not know how they got there. The detectives also noticed what appeared to be blood on petitioner's shoes and jacket, and when they asked petitioner about it, he said that his girlfriend had given him the jacket and that if there was blood on it or on his shoes, he had no idea how it got there. The detectives then asked petitioner to remove his jacket and shoes so that they could test them for blood. They also began photographing petitioner's clothing and the abrasions. At about this time, petitioner started to cry.

### 2. Second Statement

At about 7:30 p.m., the detectives terminated the interview and at about 8:00 p.m., they informed petitioner that he was under arrest for killing Christopher. Between 8:00 p.m. and 12:45 a.m., the detectives kept petitioner in the interview room but did not question him. However, they continued to take photographs, including one of a large bite mark on petitioner's back. At about 12:45 a.m. on June 7, the detectives gave petitioner Miranda warnings and began a second round of questioning. Soon after, petitioner admitted killing Garrett but said that he had done so in self-defense.

Petitioner told the officers that he suspected that Christopher had stolen a number of items from him, including a .22 caliber pistol. He said that he purchased a second gun to replace the one that he thought Garrett had stolen. He said that on June 5 he went into the bedroom that Monica shared with Christopher and saw the stolen gun, fully loaded. He laid it on an end table in the living room and confronted Christopher stating, "I found my gun, now where is my diamond ring," referring to a ring that he thought Christopher had stolen. Petitioner then said that Christopher told him "I don't know nothing about your ring," at which point petitioner and Christopher both became very angry. Christopher pushed petitioner, and

petitioner hit Christopher back. A struggle ensued. Christopher pushed petitioner into a chair and grabbed him around the top part of the back and started swinging him around the room, knocking his right leg against the wall and aggravating a sensitive bone growth on his knee.

Petitioner said that at that point, Christopher, who weighed 260 pounds, started squeezing his chest and choking him and that Christopher bit him on the back. Petitioner said that he could not breathe and felt like he was going to pass out. He stated that he feared for his life and pulled the .38 out of the waistband of his pants and fired a shot into Christopher's leg. He and Christopher then broke apart, and he stumbled backward. Christopher lunged towards the gun, and petitioner fired two shots into the area of his left arm. Petitioner said that he then fell into a chair and saw Christopher grab the .22 that he had placed on the end table. Christopher worked the .22's slide action with his right hand and appeared to petitioner to be ready to fire. Petitioner stated that he feared for his life and, as Christopher turned towards him with the gun, he fired two shots and Christopher fell to the floor on his back near the door. Petitioner stated that at this point he was very scared and began to panic. He took Christopher's gun out of his hand, placed some stereo equipment and CDs by the back stairway to make it look like a burglary and left with both guns. When petitioner finished telling the detectives what happened, he led them to the guns.

B.   **State Court Proceedings**

The state charged petitioner with first-degree intentional homicide while armed. Petitioner moved to suppress his first statement, and the trial court denied the motion. At the trial, petitioner contended that he shot Christopher in self-defense. The trial court instructed the jury on first-degree intentional homicide and, over petitioner's objection, on the lesser included offense of second degree intentional homicide – imperfect self-defense. During deliberations, the jury asked the court to explain the difference between first and second-

-4-
Case 2:03-cv-00656-LA   Filed 07/12/07   Page 4 of 15   Document 30

degree intentional homicide, and the court responded by reading Wis JI - CRIMINAL 1014. The jury convicted petitioner of first-degree intentional homicide while armed.

Petitioner moved for post-conviction relief, and the post-conviction court denied the motion. The state court of appeals affirmed the conviction and the denial of post-conviction relief. The state supreme court denied review. On collateral review, petitioner argued, among other things, that subsequent to his conviction, the Wisconsin Supreme Court had changed Wisconsin law, holding that an individual defending a first-degree intentional homicide charge on the ground of imperfect self-defense need not establish a reasonable belief of imminent danger but only an actual belief, and that he was entitled to a new trial based on the change. The state court of appeals rejected his contention, holding that he had waived the argument by not, in anticipation of the change, objecting to the trial court's jury instruction on the ground that it improperly stated the law and that the change in the law was not retroactive. The court also rejected petitioner's other arguments, and the supreme court again denied review.

## II. HABEAS STANDARD

Under § 2254(d)(1), I may grant relief only if a determination of the state court of appeals resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. Williams v. Taylor, 529 U.S. 362, 405 (2000). A state court decision can be contrary to Supreme Court precedent in at least two ways. The first is "if the state court applies a rule that contradicts" governing Supreme Court law. Id.; see also Goodman v. Bertrand, 467 F.3d 1022, 1028 (7th Cir. 2006) (stating that a state court may render a decision contrary to Supreme Court precedent if it uses the "wrong legal framework") (quoting Van Patten v. Deppisch, 434 F.3d 1038, 1042 n. 2 (7th Cir. 2006) (citing Williams, 529 U.S. at 397-98). The second is "if the state court confronts a set of facts that are materially indistinguishable" from

the facts of a Supreme Court precedent and "nevertheless arrives at different result." Williams, 529 U.S. at 406. A state court decision involves an "unreasonable application" of clearly established Supreme Court precedent if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case . . ." Id. at 407-08. The Supreme Court has acknowledged that classifying a state court decision under the "contrary to" or "unreasonable application" clause sometimes has "problems of precision." Id. at 408.

## III. DISCUSSION

### A. Applicable Law

Petitioner first argues that the state court of appeals's refusal to suppress his first statement was contrary to and an unreasonable application of Miranda v. Arizona, 384 U.S. 436 (1966). In Miranda, the Supreme Court addressed the question of how the privilege against compelled self-incrimination guaranteed by the Fifth Amendment could be protected from the coercive pressures inherent in custodial interrogation. The Court held as follows:

> [T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of [a] defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.

Id. at 444 (footnote omitted).

In Mathis v. United States, 391 U.S. 1, 4 (1968), the Court made clear that when police question a defendant who is in custody, they must give him the warnings required by Miranda, regardless of whether the questions are part of a routine investigation and regardless of

whether the defendant is in custody in connection with a case other than the one under investigation. As to the latter point, the Court stated:

> The Government also seeks to narrow the scope of the Miranda holding by making it applicable only to questioning one who is "in custody" in connection with the very case under investigation. There is no substance to such a distinction, and in effect it goes against the whole purpose of the Miranda decision which was designed to give meaningful protection to Fifth Amendment rights. We find nothing in the Miranda opinion which calls for a curtailment of the warnings to be given persons under interrogation by officers based on the reason why the person is in custody. In speaking of "custody" the language of the Miranda opinion is clear and unequivocal:
>
>> "To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." 384 U.S. at 478.
>
> And the opinion goes on to say that the person so held must be given the warnings about his right to be silent and his right to have a lawyer.

Id. at 4-5.

In Beckwith v. United States, 425 U.S. 341(1976), the Court again discussed Miranda and made clear that when the police question an individual who is in custody they must first give him Miranda warnings regardless of whether or not they suspect him of committing the offense under investigation. The Court stated:

> [I]t was the compulsive aspect of custodial interrogation and not the strength or content of the government's suspicions at the time the questioning was conducted, which led the court to impose the Miranda requirements with regard to custodial questioning . . . [Miranda is] squarely grounded on the custodial aspects of the situation, not the subject matter of the interview.

Id. at 346-47 (quoting United States v. Caiello, 420 F.2d 471, 473 (2nd Cir. 1969)).

**B.    "Contrary to" Miranda**

In the present case, on direct review, the state court of appeals affirmed the trial court's refusal to suppress petitioner's first statement on the ground that "questioning without Miranda

warnings is lawful when police 'have no reason to know that their questions would likely elicit an incriminating response.'" (Jan. 28, 2002 Decision at 4, Ex. O attached to Answer) (quoting State v. Armstrong, 223 Wis. 2d 331, 357 (1999) (in turn quoting Rhode Island v. Innis, 446 U.S. 291, 301 (1980) (footnote omitted))). On collateral review, the court of appeals reiterated that the detectives did not have to give petitioner Miranda warnings when they initially questioned him because they did not know that their questions "were reasonably likely to elicit an incriminating response." (July 20, 2004 Decision at 8, Ex. L attached to Answer).

I conclude that in resolving petitioner's motion to suppress, the state court of appeals applied a rule that contradicts Miranda and that as a result, its decision was contrary to Miranda. As previously stated, Miranda requires that when the police interrogate an individual who is in custody, they must provide warnings. In the present case, the parties agree that when the police questioned petitioner, he was in custody. Also, as previously stated, Miranda defines interrogation as "questioning initiated by law enforcement officers." Miranda, 384 U.S. at 444. In the present case, the detectives questioned petitioner, and they also initiated the questioning. They put petitioner in an interview room and questioned him for two and a half hours about a homicide. Finally, at no time during the two and a half hours of questioning did the detectives provide petitioner with Miranda warnings. However, instead of applying Miranda and suppressing petitioner's statements, as it clearly should have, the state court of appeals misinterpreted Rhode Island v. Innis, 446 U.S. 291, 301 (1980), and applied a rule that is inconsistent with Miranda.

To explain how the court went wrong, I must discuss Innis. In Innis, the police arrested the defendant for robbery and gave him Miranda warnings after which the defendant invoked his right to counsel. Subsequently, two officers transported the defendant to the police station in a squad car. Because the defendant invoked his right to counsel, the two officers could not

-8-
Case 2:03-cv-00656-LA    Filed 07/12/07    Page 8 of 15    Document 30

question him. In the squad car, the officers conversed with each other about a shotgun used in the robbery but not recovered. One officer remarked about the many handicapped children in the neighborhood (apparently a school for handicapped children was located nearby) and said that he hoped that no child found the shotgun and hurt himself. At that point, the defendant spoke up and volunteered to lead the officers to the shotgun, which he did.

The defendant later sought to suppress the shotgun, arguing that the conversation between the officers in the squad car amounted to custodial interrogation as defined in Miranda and was unlawful because he had previously invoked his right to counsel. The parties did not dispute that while in the squad car, the defendant was in custody. Thus, the issue for the Court was whether the officers' conversation in the squad car constituted interrogation.

The Court began its analysis by discussing Miranda. It noted that Miranda defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody." Innis, 446 U.S. at 298 (quoting Miranda, 384 U.S. at 444) (emphasis in Innis)). The Court then explained that the reason that the Miranda Court required officers to provide warnings prior to questioning individuals in custody was that the combination of direct questioning and custody created an "interrogation environment" that "subjugate[d] the individual to the will of his examiner" and thereby undermined the privilege against compulsory self-incrimination. Id. at 299 (quoting Miranda at 457-58).

The Court then indicated that other police practices besides direct questioning, when combined with custody, could also create the kind of interrogation environment that concerned the Miranda Court. Id. at 299-301 (stating that "the Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent") (emphasis added). The Court then sought to define when police practices that

fall short of direct questioning nevertheless constitute interrogation and stated that interrogation "refers not only to express questioning but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response," id. at 301, i.e., a response, whether inculpatory or exculpatory, that a prosecutor might use. Id. at 301 n.6.

Thus, Innis does nothing more than define when police practices other than express questioning constitute interrogation. Innis has nothing to do with cases like the present one that involve express questioning. See United States v. Montgomery, 714 F.2d 201, 202 (1st Cir. 1983) (stating that "since the questioning here was express, we have no occasion to go further. This was custodial interrogation."); see also State v. Beer, 864 A.2d 643, 651 (Vt. 2004) (stating that when questioning is express, court need not address whether police should have known that their words or actions were reasonably likely to elicit an incriminating response). The state court of appeals misread Innis as authorizing police officers who directly question individuals in custody to dispense with Miranda warnings when they do not know that their interrogation is likely to elicit an incriminating response. As discussed, Innis does nothing of the kind.

Based on its misinterpretation of Innis, the state court of appeals declined to suppress petitioner's first statement, even though the police obtained the statement by expressly questioning the defendant while he was in custody without having Miranda-ized him. Thus, the court applied a rule that contradicted (and that undermines) Miranda and reached a decision contrary to Miranda. Williams, 529 U.S. at 405; see also Goodman, 467 F.3d at 1028. In addition, the court confronted a set of facts materially indistinguishable from those in Miranda and Mathis and nevertheless arrived at a different result. For this reason also, its decision was contrary to Supreme Court precedent. Williams, 529 U.S. at 406. Finally, even

if it could be said that merely by citing <u>Miranda</u>, the state court correctly identified the governing rule, it applied the rule unreasonably to the facts of the present case. <u>Id.</u> at 407-08.

**C.      Harmless Error**

Although petitioner has established that the state court committed constitutional error, I cannot grant the writ unless the error was prejudicial. To be prejudicial, the error must have had a "'substantial and injurious effect or influence in determining the jury's verdict.'" <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 623 (1993) (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776 (1946)). If in applying the <u>Brecht</u> standard, I am left "in grave doubt about the likely effect" of the error on the jury's verdict, I must treat the error as if it had a substantial and injurious effect on the verdict. <u>O'Neal v. McAninch</u>, 513 U.S. 432, 435 (1996). Thus, respondent has the burden of establishing that the erroneous admission of petitioner's first statement did not affect the jury's verdict. <u>See</u> <u>United States v. Benitez</u>, 542 U.S. 74, 81 n.7 (2004).

When a state court improperly admits evidence, a federal habeas court assessing whether the error was prejudicial considers such factors as the salience of the evidence, the extent to which the prosecutor emphasized it in arguing to the jury and whether it duplicated other evidence. In the present case, I have reviewed the record and considered the above factors and conclude that the admission of petitioner's first statement substantially influenced the jury's decision to convict petitioner of first-degree intentional homicide.

First, petitioner's initial statement to the police was a particularly salient piece of evidence. This is so because petitioner's credibility was the critical issue in the case, and the statement directly undermined his credibility. Because the state charged petitioner with first-degree intentional homicide and because no one witnessed the incident, the prosecutor's principal task was to establish that petitioner's version of what happened, i.e., that he acted

in self-defense, was false. Petitioner's first statement enabled the prosecutor to accomplish this task by pointing out that before petitioner said that he shot Christopher in self-defense, he denied shooting him at all. The significance of petitioner's first statement is clear from the fact that the prosecutor called the detective who took the statement and had her read it in its entirety. Courts have recognized that in a self-defense case, a prosecutor's ability to show that the defendant initially denied the shooting is a powerful weapon. See, e.g., Miranda, 384 U.S. at 452 (stating that "the inconsistency between the subject's original denial of the shooting and his present admission of at least doing the shooting will serve to deprive him of a self-defense 'out' at the time of the trial.") (quoting Fred E. Inbau & John E. Reid, Criminal Interrogation & Confessions 40 ( 1st ed. 1962); see also DePetris v. Kuykendall, 239 F.3d 1057, 1063-65 (9th Cir. 2001) (stating that in a self-defense case the critical issue is the defendant's credibility and that evidentiary rulings that bear on the issue will likely affect the verdict of the jury).

Second, the prosecutor placed great weight on petitioner's initial statement in both his opening statement and his closing argument. He emphasized the inconsistency between the statement and petitioner's claim of self-defense and argued that the inconsistency gave rise to an inference that defendant's claim of self-defense was without merit. For example, in his opening statement, the prosecutor said:

> I have mentioned to you that one of the things the defendant said was that it was self-defense. You will hear from detectives that initially he said I wasn't there. I didn't do anything. I don't know anything. I don't have anything to do with this. Later he says well, yeah. I was there and I did have something to do with it. In between – and not in between chronologically – but interestingly in between I didn't do it and I did it for a reason is an illusion.

(Oct. 21, 1997 Tr. at 30-31.)

In his closing argument, the prosecutor stated:

> [Exhibit] Number 118 demonstrates how cool, calm and collected Mr. Smiley was. He tried to mislead his family by acting like a person with nothing to hide. When told the police were looking for him, he says, Oh, or words to this effect, you say the police want to talk to me? Fine, no problem and calls the police. He then proceeds to spend an hour to two hours with two detectives in the homicide unit giving them a line - I have down here a line of bull - well, a line until a chance observation of blood on his clothes causes him to switch to plan B. Imagine that. You've done what the defendant did and you simply trot down to the police station and sit there and for well over an hour you describe going here, going there, being with so and so, picking up the snake, getting rid of the snake. That's bold. That's cool.
>
> Number 119 and 120 are the handwritten and typed summaries of what Mr. Smiley had to say. Once it was obvious he wasn't going to succeed on the, quote, an intruder burglar did it ruse, it is illogical to believe that Mr. Smiley went from deception, illusion and misdirection to candor completeness and contrition. He did not do a 180 degree turn. He makes a claim of self-defense, but there is a recurring display of self-serving, self preserving and self-centeredness. The second statement contains some truth, but it contains much that you should reject as untrue. Further, the parts that you conclude are untrue should be held against Mr. Smiley. That is, people lie to gain something. The truth leads to consequences they view as unfavorable. The lie is intended to allow for undeserved, favorable consequences. So when you find a lie, don't just ignore it. You use it to calculate the truth because if someone's pointing you in that direction, that's a lie. There is a very strong likelihood you should be looking the opposite way, but that's for you to reconcile, for you to calculate the truth and to do what you can to assure that the appropriate consequences attend to the act.

(Oct. 23, 1997 Tr. at 47-48.)

The weight that the prosecutor placed on petitioner's first statement in his arguments again makes clear the importance that the state attached to it. See, e.g., Ryan v. Miller, 303 F.3d 231, 255 (2d Cir. 2002) (stating that improperly admitted evidence could not be deemed harmless because among other things the "prosecutor refer[red] to the erroneous evidence in his closing"); see also Ghent v. Woodford, 279 F.3d 1121, 1131 (9th Cir. 2002) (stating that the prosecutor "relied heavily on [improperly admitted testimony] . . . during both opening and closing arguments" thereby "demonstrat[ing] just how critical the State believed the erroneously admitted evidence to be").

Third, petitioner's initial statement was unlike and thus not duplicative of any other piece of evidence. No other evidence raised the question of why, if petitioner truly acted in self-defense, he initially denied involvement. See, e.g., Agnew v. Leibach, 250 F.3d 1123, 1135 (7th Cir. 2001) (stating error not harmless because, among other things, improperly admitted statement "was not cumulative in any sense").

Finally, this was a case that could have gone different ways depending on whether the jury believed petitioner. The jury could have acquitted petitioner or convicted him of the lesser included offense of second-degree intentional homicide – imperfect self-defense. Even if, but for the first statement, the jury would have convicted petitioner of second-degree rather than first-degree intentional homicide, the statement nevertheless had a substantial and injurious effect on the verdict. See Jackson v. Virginia, 443 U.S. 307, 323-24 (1979) (stating that "[u]nder our system of criminal justice, even a thief is entitled to complain that he has been unconstitutionally convicted and imprisoned as a burglar").

Based on my resolution of petitioner's Miranda claim, I will not address his other claims.

## IV. CONCLUSION

Therefore,

**IT IS ORDERED** that petitioner's application for a writ of habeas corpus is **GRANTED**, and that petitioner be released within 120 days of the date of this decision unless the state decides to retry him.

Dated at Milwaukee, Wisconsin this 12 day of July 2007.

/s_____
LYNN ADELMAN
District Judge